IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **FIDELITY BROKERAGE SERVICES LLC,**<br>**155 Seaport Boulevard**<br>**Boston, Massachusetts 02210,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **CASE NO.** |
| | : | |
| **MICHAEL GIORDANO,**<br>**229 Georgia Road**<br>**Freehold, New Jersey 07728** | : | |
| | : | |
| **Defendant.** | : | |

## COMPLAINT

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") seeks injunctive relief against Defendant, its former employee Michael Giordano ("Giordano"), along with an Order compelling arbitration before a Financial Industry Regulatory Authority ("FINRA") Arbitration Panel, pursuant to Rules 13200 and 13804 of the FINRA Code of Arbitration Procedure. Giordano is presently misusing Fidelity's confidential and trade secret customer information, which he obtained knowledge of and access to as a result of his employment with Fidelity, for the improper purpose of soliciting Fidelity customers to transfer their Fidelity accounts to Merrill Lynch, his new employer. Giordano's conduct, among other things, breaches his Employee Agreement with Fidelity and violates New Jersey and federal law protecting Fidelity's trade secret information.

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Fidelity Brokerage Services LLC is a Delaware Limited Liability Company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized

and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts.  Fidelity is a member firm of FINRA.

2.     Defendant Michael Giordano is a former Financial Consultant of Fidelity's Manalapan, New Jersey office.  He is an adult citizen and resident of New Jersey.  Giordano is registered with FINRA.

3.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter involves a cause of action arising under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831 *et seq*.  *See* 18 U.S.C. § 1836(c) (West 2017) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section."). This Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. § 1367 because the claims are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy.  Notably, the Defendant used Fidelity's customer information to solicit Fidelity customers.

4.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  Indeed, Giordano's conduct threatens approximately 257 Fidelity client households, representing in excess of $215 million in client assets under Fidelity management.

5.     Venue is proper in this District because Giordano lives and works in this District, and most or all of the conduct alleged in this Complaint occurred within this District.

2

## NATURE OF THE CASE

6.      Through this action, Fidelity seeks immediate injunctive and other relief to stop Defendant's continuing violation of his Employee Agreement, misappropriation of Fidelity's trade secrets, and unfair competition.

7.      Giordano, a former Fidelity Financial Consultant, has used Fidelity's confidential and trade secret customer information, that he had access to by virtue of his employment with Fidelity, to unlawfully solicit Fidelity customers to transfer their business to Merrill Lynch.

8.      On January 12, 2018, Giordano abruptly resigned from Fidelity and immediately joined On January 12, 2018, Giordano abruptly resigned from Fidelity and immediately joined a nearby office of a Fidelity competitor, Merrill Lynch.

9.      At the time that Giordano resigned, Fidelity reminded him of his legal and contractual obligations to Fidelity.

10.      Further, immediately after Giordano gave notice that he was resigning, Fidelity sent a letter to Mr. Giordano which outlined his legal obligations, specifically his promise not to take or use confidential Fidelity information, including information regarding Fidelity's customers, and not to solicit Fidelity customers.  The letter also enclosed a copy of his Employee Agreement.  A true and correct copy of this reminder letter is attached to the Declaration of Marina Tranchina as Exhibit F.

11.      Despite those obligations, Giordano misappropriated Fidelity's confidential and trade secret customer information and began using and continues to use that information to unlawfully target Fidelity customers to solicit them to transfer their accounts to Merrill Lynch.

12.      Fidelity seeks a temporary restraining order, and thereafter a preliminary injunction, requiring Defendant to return to Fidelity any and all records and/or documents in any

form, received or removed from Fidelity by Defendant, containing information pertaining to customers Giordano served or whose names became known to Giordano while in the employ of Fidelity, including, but not limited to, any customer list or documents replicated or "recreated" by Giordano from memory or otherwise, or using Fidelity's confidential and trade secret information concerning Fidelity's customers. Fidelity also seeks an order prohibiting further solicitation of Fidelity clients by Giordano. This injunctive relief is necessary to end Defendant's unlawful activities, which include misuse of Fidelity's trade secrets and unfair competition.

13.     Fidelity and Giordano are obligated to arbitrate the merits of this dispute consistent with the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200. Accordingly, concurrently with the filing of its Motion for a Temporary Restraining Order and Preliminary Injunction, Fidelity also is filing a Statement of Claim with FINRA Dispute Resolution, Inc. seeking binding arbitration of this dispute pursuant to Rule 13804(a)(2).

14.     Although the merits of this case will be resolved in arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed. Once an injunction is issued by this Court, an expedited arbitration will be scheduled with FINRA within fifteen (15) days of the entry of the injunction. If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, will be assigned to a standard-track arbitration, which would likely delay a hearing on the merits for a year or more. Temporary and preliminary injunctive relief, therefore, is required to preserve the *status quo* until the merits of this case can be adjudicated by FINRA.

## FACTS COMMON TO ALL COUNTS

### Fidelity's Unique Customer Development Practices

15.     Fidelity and its affiliates provide a variety of financial services—such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services—to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships.   Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual funds from Fidelity and other well-known fund companies.

16.     Fidelity is unique in the retail brokerage field because Fidelity does not have its Account Executives, including its Financial Consultants, such as Giordano, make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity.

17.     Instead, Fidelity requires its Financial Consultants to develop service relationships based upon leads that Fidelity provides.

18.     Fidelity provides leads to its Financial Consultants from two primary sources.

19.     First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person.

20.     Fidelity and its affiliates devote tens of millions of dollars per year toward attracting customers to Fidelity's various businesses in a variety of means.  Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and Fidelity maintains prominent retail locations which prospective customers can visit.

21.    A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.

22.    Second, Fidelity forwards information to its representatives regarding customers, with whom Fidelity already has a relationship, when those customers experience "triggering events," such as Fidelity 401(k) distributable events, which may lead to interest in Fidelity's retail financial services.

23.    In addition, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position.  Moreover, Fidelity clients may be serviced by multiple Fidelity representatives depending upon the clients' needs and service offerings in which they opt to participate at Fidelity.

24.    A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.

25.    Fidelity's lead-based approach to supporting its Financial Consultants distinguishes Fidelity from other full-service brokerages, such as Giordano's new employer, Merrill Lynch, where individual brokers, rather than the firm, are responsible for establishing customer relationships.

26.    Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers.

### Fidelity's Trade Secret Customer Information

27.    Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as Giordano, is directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets.

28.     Fidelity's trade secret customer data includes not only the names and contact information of Fidelity customers, but also includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth.

29.     Although certain portions of such information might be publicly available — such as an individual's name or published home telephone numbers — only a limited number of Fidelity employees know who among the general public are Fidelity customers who have demonstrated a specific need and desire for investment services.

30.     Fidelity developed its customer base through a significant investment of time, labor, and capital, as described above.

31.     Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence.

32.     Fidelity derives substantial economic value from preserving its customer data as a trade secret.

33.     Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to or specific knowledge of Fidelity's trade secret customer data.   In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.

**Fidelity's Efforts to Preserve the Confidentiality of Its Customer Data**

34.    Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information.  Fidelity does not provide its trade secret customer data to competitors.

35.    Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access.

36.    Fidelity maintains and advises its employees of a Global Policy on Information Protection that is displayed on Fidelity's intranet.  A true and correct copy of Fidelity's Global Policy on Information Protection is attached to the Declaration of Marina Tranchina as Exhibit B.  Fidelity periodically reminds its employees of this policy and provides employees with a Quick Reference Card ("QRC") explaining how to protect specific types of Fidelity confidential information.  A true and correct copy of Fidelity's QRC is attached to the Tranchina Declaration as Exhibit C.

37.    Fidelity also preserves trade secret customer data by requiring employees, including Giordano, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity confidential information, including Fidelity customer information, outside of Fidelity.

38.    Fidelity has been vigilant in protecting its customers' privacy because most Fidelity customers do not want, and have not authorized, Fidelity to share their contact or financial information outside of Fidelity.  Furthermore, as discussed more fully below, Fidelity is required by federal law to prevent the disclosure to third-parties of nonpublic customer

information, including customers' contact information and financial information. *See* 15 U.S.C. § 6801, *et seq.*; 17 C.F.R. § 248.1, *et seq.*

### Giordano Agreed to Protect the Confidentiality of Fidelity's Trade Secret Customer Information and Not to Solicit Fidelity Customers

39.     At the time of his resignation on January 12, 2018, Giordano was a Financial Consultant in Fidelity's branch office in Manalapan, New Jersey.  While working at Fidelity, Giordano was assigned a list of clients to service on behalf of Fidelity.

40.     Fidelity customers with invested assets above $250,000 are assigned to be serviced by Financial Consultants, such as Giordano.  This provides various benefits to these customers, including access to a dedicated Financial Consultant to manage their Fidelity relationship.

41.     In order for Giordano to service the customers' accounts he was assigned to service, Giordano required access to the customers' confidential personal and financial information.

42.     Giordano specifically acquired access to and knowledge of the names, contact information and confidential financial data for numerous Fidelity clients.  By the time of his departure, he had daily access to and had gained knowledge of confidential Fidelity information relating to approximately 257 households, representing in excess of $215 million in client assets under Fidelity management.  Moreover, throughout his employment at the Manalapan branch, the confidential information to which Giordano was given access was continually updated as clients were added, new accounts were opened, client assets and investments changed value, clients' financial goals evolved, and as a result Giordano was provided with ongoing access to a pool of continually updated and evolving confidential information about the Fidelity clients he was assigned to service.

43.     Fidelity protects its customers' information by requiring each employee who will have access to that information to execute a standard Fidelity Employee Agreement.

44.     Fidelity records indicate that Giordano executed the Employment Agreement on January 31, 2012, prior to the first day of his employment on March 5, 2012.  Mr. Giordano then renewed his commitment to the provisions by signing it again in connection with his promotion to become a Financial Consultant in 2015.  Copies of Mr. Giordano's signed 2012 and 2015 Employee Agreements are attached to the Tranchina Declaration as Exhibits D and E.

45.     In his Employee Agreement, Giordano acknowledged the confidentiality of Fidelity's records, including Fidelity's customer lists and customer information.  See Tranchina Exhibits D and E at ¶ 1.

46.     Giordano promised to use Fidelity's trade secrets only in the course of his employment with Fidelity and not to divulge Fidelity's trade secrets to third parties.  Id.

47.     Giordano promised that, upon termination of employment, he would "return all company property … including but not limited to Confidential Information."  Id. at ¶ 3.

48.     Giordano also promised that following termination of employment he would not use Fidelity's Confidential Information to solicit Fidelity's clients.  Id. at ¶ 6.

49.     Giordano further promised that for a period of one year following termination of his employment he would not "directly or indirectly … solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of the Employee's employment with the Fidelity Companies."  Id.

50.     Giordano agreed that any violation of the Employee Agreement—including after his termination—would cause Fidelity irreparable damage and would entitle Fidelity to seek injunctive relief to protect its trade secret customer information. Id. at ¶ 10.

51.     As consideration for the Employee Agreements Giordano executed, Fidelity hired and thereafter continued to employ him for a period of five (5) years, promoted him, provided him with ongoing access to continually updated confidential business information, compensated him throughout his employment, and provided him with introductory and continuing on-the-job training, and promotions.  Fidelity assigned Giordano a customer list of higher asset customers to service on behalf of Fidelity and provided Giordano with leads to enable him to succeed at Fidelity.  Fidelity further provided Giordano with support services; paid for facilities, computer equipment, market reporting services, and all other business expenses; and registered Giordano with the Financial Industry Regulatory Authority and the New York Stock Exchange.  Fidelity provided Giordano with sales assistance, research, the benefit of Fidelity advertising, goodwill and name recognition, access and use of experts in asset management, tax, estate planning and insurance, and with promotional marketing and sales support.

### Giordano Misappropriated Fidelity's Trade Secret Customer Information And Is Using It For The Benefit Of Himself and His New Employer

52.     Despite his contractual obligations and his obligations under New Jersey law, Giordano misappropriated Fidelity's trade secret customer information and used and continues to use Fidelity's trade secret customer information to solicit Fidelity customers on behalf of Merrill Lynch.

53.     On Friday, January 12, 2018, Giordano submitted his resignation and immediately began to work for Merrill Lynch.  At the time of his resignation, Giordano was reminded of his post-employment obligations to Fidelity and his obligation not to take Fidelity customers, and

Mr. Giordano assured his former Branch Manager that he intended to comply with his commitments.

54.     Fidelity and Merrill Lynch are competitors in connection with efforts to provide retail brokerage services, investment portfolio management services, wealth management, investment planning, and other financial services to customers.

55.     Despite Giordano's promise to abide by his legal obligations, following his resignation, Fidelity began to receive reports from customers indicating that he was contacting Fidelity customers formerly assigned to his practice.

56.     A number of these contacts were memorialized in Fidelity's customer interaction software program known as "Salesforce." Each time a Fidelity representative has an interaction with a customer, he or she is required to enter information concerning that interaction (i.e. substance of discussion) in the "notes" section of Salesforce. All Salesforce information is identified as confidential and required to be treated as such. In accordance with this required business practice, the Fidelity employees who spoke with customers formerly serviced by Giordano following his resignation recorded notes of those interactions in the Salesforce system.

57.     Patrick Sullivan and Wendy Vallery are two of the Fidelity employees who have been in contact with Fidelity customers formerly serviced by Mr. Giordano. Although Fidelity's investigation is ongoing, already during the course of their calls with clients, at least five clients have reported that Mr. Giordano contacted them in the short time since his resignation regarding his new employment with Merrill Lynch. Significantly, one of those clients reported that Mr. Giordano called the client and "asked for his business". The client said that Mr. Giordano gave him his contact information, including his cell phone number, for him to call him in the future. The client then confirmed to Fidelity's employee that he had no intention of leaving Fidelity,

even though Mr. Giordano had asked for his business.  Another client similarly stated that Mr. Giordano had contacted him but that client also volunteered that he was not going to leave Fidelity, indicating that the client believed that Mr. Giordano had been trying to obtain that client's business.

58.    The only way Giordano could have known these particular individuals were customers of Fidelity and how to best contact them is by exploiting the ongoing access he was given to Fidelity's constantly updated confidential and trade secret information, and using his knowledge of that confidential information about Fidelity's clients to identify and target Fidelity clients for this own benefit, and the benefit of a Fidelity competitor.

59.    The reports from Fidelity customers, therefore, strongly suggest that Giordano has in his possession and is using Fidelity's confidential and trade secret customer information on behalf of his new employer, Merrill Lynch.

## The Threat of Immediate and Irreparable Harm
## Fidelity Faces from Defendant's Conduct

60.    Defendant's conduct has irreparably harmed Fidelity and will continue to irreparably harm Fidelity if not stopped immediately.  Indeed, Defendant's conduct has and will continue to irreparably harm Fidelity's relationships with its customers, such as by losing goodwill, losing future business or referrals, as well as losing trust and confidence in securing inherently-private information, which cannot be calculated with precision and cannot be adequately compensated.

61.    Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations.  The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect

the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a) (2012). The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent. 17 C.F.R. § 248.10 (2017). Nonpublic personal information is defined to include customer lists from financial institutions, *even if those lists contain only names of Fidelity customers* because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations. 17 C.F.R. § 248.3(t)(1) (2017); 17 C.F.R. § 248.3(u)(2)(i)(D) (2017). Indeed, these regulations also protect a customer's account information. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

62.     Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. Thus, customers understandably are concerned when former Fidelity employees, such as Giordano, have access to their information and are using it to solicit their business at a new and different brokerage institution.

63.     In other words, the damage to Fidelity's customer relationships has already occurred, is ongoing and is incalculable, as Fidelity cannot put a price on the value of its customer relationships or the damage caused when Defendant took and improperly misused confidential and trade secret customer information on behalf of a competitor.

64.     Based on all the foregoing facts and conduct, Fidelity believes and thereon alleges that Defendant is prepared to engage in, is engaging in, and plans to continue to engage in the following wrongful acts:

- use and/or disclosure of Fidelity's trade secret customer information and misappropriation of the trade secret information contained in confidential Fidelity

business records, including specifically the names, addresses, phone numbers, and/or other confidential financial information of Fidelity customers;

- transmission verbally, in writing or in another manner for the use of a Fidelity competitor, customers' contact and financial information contained in Fidelity's records; and

- solicitation of Fidelity customers on behalf of Merrill Lynch.

65.     Fidelity has been and continues to be damaged, both monetarily and irreparably, by the actual and threatened loss of customers and customer goodwill caused by Defendant's misappropriation and misuse of Fidelity's trade secret customer information and solicitation of Fidelity's customers in violation of his Employee Agreement and in violation of New Jersey law.

66.     Denial of injunctive relief would also leave Fidelity vulnerable to the same conduct from other employees.

67.     Fidelity asks for the Court's assistance in protecting that information and stopping Defendant's knowing and intentional wrongful conduct.

## FIRST CAUSE OF ACTION
### (Injunctive Relief)

68.     Fidelity hereby realleges and incorporates by reference the allegations of paragraphs 1 through 67 of the complaint, inclusive, as though set forth in full.

69.     In doing the acts described herein, Defendant has harmed Fidelity by, among other things, improperly garnering, retaining, disclosing and utilizing Fidelity's confidential and proprietary information and trade secrets, in violation of federal and New Jersey law, to give Giordano a competitive edge over Fidelity, attempting to poach Fidelity's customer accounts, and diminishing Fidelity's reputation and goodwill.

70.     Unless the Defendant is preliminarily, as well as permanently, enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a)     Disclosure of trade secrets, customer lists, and other confidential

information that is solely the property of Fidelity and its clients;

(b)     Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(c)     Potential future economic loss, which is presently incalculable.

71.     Thus, Fidelity is entitled to temporary and preliminary injunctive relief.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

72.     The allegations of Paragraphs 1 through 71 are incorporated herein by reference with the same force and effect as if set forth in full below.

73.     Giordano's Employee Agreements are valid contracts supported by adequate consideration.

74.     In the Employee Agreements, Giordano acknowledged that as a consequence of his employment with Fidelity, and in order to assist him in performing the duties of a Financial Consultant, Giordano would be given access to Confidential Information about Fidelity's clients. See Exhibits D and E to the Tranchina Declaration at ¶1.  As described above, this information was provided to Giordano not only at the outset of his employment, but he also was provided with continuing access to an evolving and nearly continually updated pool of information about the Fidelity clients he was assigned to service, all of which was essential to his ability to perform his job duties in his ultimate position as a Financial Consultant of Fidelity.

75.     Pursuant to the terms of his Employee Agreements, Giordano agreed to keep Fidelity's records, including particularly Fidelity's customer lists and customer information, confidential.  Exhibits D and E to the Tranchina Declaration at ¶ 1.

76.    Giordano promised to use Fidelity's customer information only in the course of his employment with Fidelity, and promised not to divulge Fidelity's customer information to third parties such as Merrill Lynch.  Exhibits D and E to the Tranchina Declaration at ¶ 1.

77.    Giordano violated the confidentiality and non-disclosure provisions of his Employee Agreements by sharing Fidelity's confidential customer information with Merrill Lynch and/or using Fidelity's confidential customer information on behalf of himself and/or Merrill Lynch including by using that information to solicit Fidelity clients to follow him to Merrill Lynch.

78.    Giordano also promised to return any of Fidelity's customer information in his possession to Fidelity upon termination of his employment.  Exhibits D and E to the Tranchina Declaration at ¶ 3.

79.    Giordano sought to circumvent and in fact breached this provision of his Employee Agreements by, on information and belief, either taking the Confidential Information, or creating or recreating the Confidential Information from memory for competitive use at Merrill Lynch.

80.    Giordano also promised that he would not solicit Fidelity customers for a period of one year after his termination.  Exhibits D and E to the Tranchina Declaration at ¶ 6.

81.    Giordano breached the non-solicitation provision of his Employee Agreements by using his knowledge of Fidelity's customer information to solicit Fidelity customers to transfer their business to Giordano at Merrill Lynch.

82.    Giordano continues to violate his contractual obligations, and will continue to violate these obligations in the future.

83.     As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss.

84.     In his Employee Agreement, Giordano expressly agreed that "violation of this Agreements will cause irreparable damage" to Fidelity.   Exhibits D and E to the Tranchina Declaration at ¶ 10.

85.     Unless Giordano is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

      (a)     Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

      (b)     Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

      (c)     Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

      (d)     Potential future economic loss, which is presently incalculable.

### THIRD CAUSE OF ACTION
**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1831 *et seq.*)**

86.     The allegations of Paragraphs 1 through 85 are incorporated herein by reference with the same force and effect as if set forth in full below.

87.     The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Defendant pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, in one or more of the following respects.

88.   Fidelity's above-described trade secrets, including the contact and confidential financial and account information of Fidelity customers, are subject to reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality.  Fidelity's customer information is not generally known.

89.   Defendant has used Fidelity's customer information without Fidelity's consent. Giordano engaged in this conduct on behalf of Merrill Lynch despite acquiring this information under circumstances (of which Merrill Lynch is also aware) giving rise to a duty to maintain the information's secrecy and limit its use, which duty Giordano owed and continues to owe Fidelity as a former agent, employee and representative of Fidelity.

90.   Such information is also protected as "non-public" information under federal securities Regulation S-P.  17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u).  Accordingly, Fidelity is required by federal statute to ensure that non-public customer contact, financial, and account information such as that misappropriated by Defendant is not disclosed to third parties without consent.  17 C.F.R. § 248.10.

91.   Fidelity derives a significant economic benefit from the above-described trade secrets.

92.   Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from Defendant's ongoing misappropriation and misuse of Fidelity's trade secret customer information.

93.   Unless the Defendant is temporarily and preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a)   Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

(b)   Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

(c)   Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(d)   Potential future economic loss, which is presently incalculable.

94.   Defendant's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

95.   Thus, Fidelity is entitled to temporary and preliminary injunctive relief, restitution, compensatory and exemplary damages, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836.

## FOURTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets in Violation of the New Jersey Trade Secret Act)

96.   The allegations of Paragraphs 1 through 95 are incorporated herein by reference with the same force and effect as if set forth in full below.

97.   As described above, Fidelity possessed trade secrets, including the contact and confidential financial and account information of Fidelity customers, which are subject to reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality.

98.   Defendant has used Fidelity's trade secret customer information without Fidelity's consent.  Giordano engaged in this conduct despite a duty to maintain the information's secrecy and limit its use.

99.     Plaintiff derives economic value from this confidential information, due to it not being generally known to other persons who could obtain economic value from its disclosure or use.

100.    Plaintiff has made efforts that are reasonable under the circumstances to maintain the secrecy of such information.

101.    Defendant is using this information to compete with Plaintiff and to injure Plaintiff's relationships with its clients.

102.    The disclosure and use of such information constitutes a misappropriation of trade secrets in violation of applicable law, including the New Jersey Trade Secrets Act, N.J.S.A. 56:15-1.

103.    Defendant's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets and has caused Plaintiff irreparable harm and loss.

104.    Accordingly, Fidelity is entitled to temporary and preliminary injunctive relief, restitution, compensatory, and exemplary damages and reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
### (Unfair Competition and Violation of N.J.S.A. 56:4-1)

105.    The allegations of Paragraphs 1 through 104 are incorporated herein by reference with the same force and effect as if set forth in full below.

106.    Defendant's conduct constitutes an unfair method of competition and a violation of N.J.S.A. 56:4-1.

107.    As a direct and proximate result of the acts and course of conduct of Defendant described above, Fidelity has suffered and will continue to suffer irreparable harm and loss.

## PRAYER FOR RELIEF

For the reasons set forth above, Fidelity respectfully requests that the Court enter an injunction order, pending arbitration before FINRA or until further order of the Court:

1.  Enjoining Defendant and anyone acting in concert with Defendant, including any agent, officer, employee, or representative of Defendant's new employer, effective immediately, from using, disclosing, transmitting or continuing to possess for any purpose, the information contained in the records of Fidelity, including, but not limited to, the names, addresses, and confidential financial information of Fidelity customers or prospective customers whom Giordano served or whose names became known to him while in the employ of Fidelity;

2.  Ordering Defendant and anyone acting in concert with Defendant to return to Fidelity any and all records, information and/or documents in any form, received or removed from Fidelity by Giordano containing information pertaining to customers or prospective customers of Fidelity whom Giordano served or whose name became known to Giordano while in the employ of Fidelity, within five (5) days from the entry of this Court's Order, including any and all copies.  This requirement includes all records, information or documents, in any form, created by Giordano, or anyone acting in concert with him, based on documents or information that was received or removed from Fidelity by Giordano, and specifically includes any list of Fidelity customer names that may have been created or recreated by Giordano from memory, or derived from a list created or recreated by Giordano from memory;

3. Enjoining Giordano from soliciting or inducing, whether directly or indirectly, and whether alone or in concert with others, including Defendant's new employer, any business from any Fidelity customer whom Giordano served or whose name became known to Giordano while in the employ of Fidelity, including, without limitation, all customers Giordano learned of through his employment with Fidelity; and

4. Directing that Fidelity and Defendant, pursuant to the Federal Arbitration Act, 9 U.S.C. §§3-4, shall proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

Dated: January 23, 2018

Respectfully submitted,

FISHER PHILLIPS LLP

Susan M. Guerette
150 N. Radnor Chester Rd., Ste. C300
Radnor, PA 19087
TEL: (610) 230-2150
FAX: (610) 230-2151
sguerette@fisherphillips.com

*Attorneys for Plaintiff*