## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **FIDELITY BROKERAGE SERVICES LLC,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **CASE NO.** |
| : | |
| **MICHAEL GIORDANO,** : | |
| : | |
| **Defendant.** : | |

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND..................................................................................................2

   A.   Fidelity's Unique Business Model And Its Protection Of Trade Secret Customer
        Information. ....................................................................................................................2

   B.   Giordano Agreed To Preserve The Confidentiality Of Fidelity's Trade Secret Customer
        Information And Not To Solicit Fidelity Customers...........................................................4

   C.   Giordano Solicits Customers and Misappropriates Fidelity's Trade Secret Customer
        Information ......................................................................................................................5

ARGUMENT ........................................................................................................................6

   I.   The Standards for Granting Injunctive Relief Strongly Favor Granting Fidelity Relief in
        this Case.........................................................................................................................6

   II.   Fidelity Is Likely To Succeed On The Merits on Its Breach Of Contract and Trade
        Secrets Claims ................................................................................................................9

        A.  Fidelity's Breach of Contract Claim...................................................................9

            1.   Giordano's Agreement is Enforceable Under New Jersey Law ....................9

                a. Fidelity's Interests Are Legitimate and Protectable ..............................9

                b. The Defendant's Agreements are Reasonable in Time and Geographic
                   Scope and Impose no Undue Hardship on the Employee ....................10

                c. Giordano's Agreements are not injurious to the public. ......................12

                d. Giordano Breached His Agreements....................................................12

                   (i)   Giordano Solicited Multiple Fidelity Customers.......................12

                   (ii)   Giordano's Contacts Were Solicitations....................................12

                     (iii)   Giordano Used Fidelity's Confidential Client Information........16

        B  Fidelity's Trade Secret Claim .............................................................................17

            1.   Fidelity's Customer List is a Protectable Trade Secret ................................17

            2.   Giordano's Actions Violate Federal and State Law.......................................20

   III.   Fidelity Has No Adequate Remedy at Law...................................................................23

   IV.   The Balance of Interests Favors Fidelity and Granting Injunctive Relief Serves the Public
          Interest .........................................................................................................................25

V.    A Temporary Restraining Order Will Maintain the *Status Quo* Pending Arbitration.......25

VI.   This Court May Enter Injunctive Relief Even Though the Merits Will Be Decided in Arbitration. ...........................................................................................................26

VII.  There Is No Need for a Bond.............................................................................27

VIII. Request for Expedited Discovery .....................................................................27

CONCLUSION ........................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.T. Giordano & Co. v. Donovan,*
216 N.J. Super. 426 (App. Div. 1987)................................................................9, 10

*Al Minor & Assoc. v. Martin,*
881 N.E.2d 851 (Ohio 2008) ..............................................................................21

*Allen v. Johar, Inc.,*
308 Ark. 45 (1992) ............................................................................................22

*Ameriquest Mortgage Co. v. Washington State Office of Atty. Gen.,*
170 Wash. 2d 418 (Wash. 2010) ........................................................................17

*AYR Composition, Inc. v. Rosenberg,*
261 N.J. Super. 495 (App. Div. 1993)...................................................................6

*Blumenthal v. Merrill Lynch,*
910 F.2d 1049 (2d Cir. 1990) .......................................................................2, 26

*Cent. Plastics Co. v. Goodson,*
1975 Okla. 71 (1975)..........................................................................................22

*Charles Schwab & Co., Inc. v. Karpiak,*
2007 WL 136743 (E.D. Pa. Jan. 12, 2007)......................................................6, 25

*Charles Schwab & Co. v. Karpiak,*
2006 U.S. Dist. LEXIS 92763 (E.D. Pa. 2006) .............................................12, 14

*Charles Schwab & Co., v. McMurry,*
2008 U.S. Dist. LEXIS 104140 (M.D. Fla. Dec. 23, 2008) ................................13

*Cmty. Hosp. Grp. v. More,*
183 N.J. 36................................................................................................11

*Cmty. Hosp. Grp. v. More,*
365 N.J. Super. 84 (App. Div. 2003), *aff'd in part & rev'd in part on other
grounds,* 183 N.J. 36 (2005) ......................................................................10, 24

*Compass Bank v. Hartley,*
    430 F. Supp.2d 973 (D. Ariz. 2006) ........................................................................... 14, 15

*Crowe v. DeGioia,*
    90 N.J. 126 (1982) ........................................................................................................ 2, 6

*Diamond Power Internaitonal v. Clyde Bergemann, Inc.,*
    2005 U.S. Dist. LEXIS 12493 (N.D. Ga. Jan. 5, 2005) ................................................. 22

*Diversified Indus., Inc. v. Vinyl Trend, Inc.,*
    2014 WL 1767471 (D.N.J. 2014) .................................................................................... 18

*Ed Nowogroski Ins., Inc. v. Rucker,*
    137 Wash.2d 427 (1999) ................................................................................................. 21

*Fidelity Brokerage Serv. LLC v. Alexopoulos,*
    No. 03-5362 (Mass. Super. Ct. 2003) ............................................................................... 8

*Fidelity Brokerage Serv. LLC v. Donovan,*
    No. 03-2286 (Mass Super. Ct. 2003) ................................................................................. 8

*Fidelity Brokerage Serv. LLC v. Downey,*
    No. 08-1637 (JFB) (E.D.N.Y. 2008) ................................................................................. 8

*Fidelity Brokerage Serv. LLC v. Fassenfeld,*
    No. 013945/11 (NY Sup. Ct. 2011) ................................................................................... 8

*Fidelity Brokerage Serv. LLC v. Franz,*
    No. 8/9564 (N.Y. Sup. Ct. 2008) ...................................................................................... 8

*Fidelity Brokerage Serv. LLC v. Johnson,*
    No. A04-CA-662-SS (W.D. Tex. 2004) ............................................................................ 8

*Fidelity Brokerage Serv. LLC v. Jones,*
    No. 04-3478 (S.D. Tex. 2004) ........................................................................................... 8

*Fidelity Brokerage Serv. LLC v. McNamara,*
    No. 11-1092, 2011 WL 2117546 (S.D. Cal. May 27, 2011) ............................................. 8

*Fidelity Brokerage Serv. LLC v. Parker,*
    No. 04-1027 (S.D. Cal. 2004) ........................................................................................... 8

*Fidelity Brokerage Serv., LLC v. Rocine,*
    Case No. 417-cv-4993-PJH (N.D. Cal. 2017 ................................................................... 8

*Fidelity Brokerage Serv. LLC v. Rousseaux,*
    No. 03- 01319 ................................................................................................................... 8

*Fidelity Brokerage Serv. LLC v. Rupp,*
    No. 05- 00083 ...................................................................................................8

*Fidelity Brokerage Serv. LLC v. Sanchez,*
    No. 08-03863 (C.D. Cal. 2008) ....................................................................8

*Fidelity Brokerage Serv. LLC v. Stockwell,*
    No. 05-0455 ....................................................................................................8

*Fidelity Brokerage Serv. LLC v. Umstead,*
    No. 07-347 (E.D. Va. 2007) ..........................................................................8

*Fidelity Brokerage Serv. LLC v. Vance,*
    No. 07-1230 (C.D. Cal. 2007) ......................................................................8

*Fidelity Brokerage Serv. LLC v. Vee,*
    No. 12-1986 (D. Colo. 2012) ........................................................................8

*Fidelity Brokerage Serv. LLC v. Wilder,*
    No. 11-37296 (Mass. Super. Ct. 2011) ........................................................8

*Fidelity Global Brokerage Group v. Beatty,*
    No. 652147 ......................................................................................................8

*Fidelity Global Brokerage Group v. Gray,*
    No. 10-1255 (E.D. Va. 2010) ........................................................................8

*First W. Capital Mgmt. Co. v. Malamed,*
    16-CV-1961-WJM-MJW, 2016 WL 8358549 (D. Colo. Sept. 30, 2016)................21

*Hilliard Lyons v. Clark,*
    2007 WL 2589956 (W.D. Mich. Aug. 31, 2007) ........................................2

*Inc. v. Sims,*
    312 N.J. Super. 195 (Ch. Div. 1998) ..........................................................6

*J.P. Morgan Chase Bank, N.A. v. Pudlak,*
    No. 2:15-cv-03216 (D.N.J. January 7, 2016) ..............................................7

*J.P. Morgan Chaser Bank, N.A. v. Eosso,*
    No. 2:15-cv-06182 (D.N.J. August 14, 2015) ............................................7

*Jet Spray Cooler, Inc. v. Crampton,*
    361 Mass. 835 (1972) ..................................................................................22

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ......................................................................27

*JP Morgan Chase v. Clark,*
    2009 U.S. Dist. LEXIS 89926 (E.D. Mich. 2009) ................................................................... 14

*Karlin v. Weinberg,*
    148 N.J. Super. 243 (App. Div. 1977), *aff'd,* 77 N.J. 408 (1978) ......................................... 10

*Karlin v. Weinberg,*
    77 N.J. 408 (1978) ............................................................................................................ 9, 11

*Kaye v. Rosefielde,*
    223 N.J. 218 (2015) ................................................................................................................... 6

*Lamorte Burns & Co. v. Walters,*
    167 N.J. 285 (2001) ................................................................................................................... 6

*Latuszewski v. VALIC Financial Advisors, Inc.,*
    393 Fed. Appx. 962 (3d Cir. 2010) ........................................................................................ 21

*M.N. Dannenbaum, Inc. v. Brummerhop,*
    840 S.W.2d 624 (Tex. App. 1992) .......................................................................................... 22

*Mailman, Ross v. Edelson,*
    183 N.J. Super. 434,441 (1982) ............................................................................................. 10

*Marsellis-Warner Corp. v. Rabens,*
    51 F. Supp. 2d 508 (D.N.J. 1999) .......................................................................................... 23

*Martinez v. New York,*
    2008 WL 343556 (D.N.J. 2008) ............................................................................................... 6

*Maw v. Advanced Clinical Commc'ns,*
    179 N.J. 439 (2004) ................................................................................................................... 9

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Bishop,*
    No. 04-CIV-5567 (D.N.J. Nov. 15, 2004) ................................................................................ 7

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dewey,*
    2004 WL 1515502 (Mass. Super. June 30, 2004) ................................................................... 6

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lascelle,*
    No. 05-CIV-2037 (D.N.J. April 18, 2005) ............................................................................... 7

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McClafferty,*
    287 F. Supp. 2d 1244 (D. HI. 2003) ...................................................................................... 15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Miserendino,*
    No. 05-CIV-1849 (D.N.J. April 11, 2005) ............................................................................... 7

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano,*
 85 F. Supp. 2d 491 (E.D. Pa. 2000)..................................................................7, 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano,*
 999 F.2d 211 (7th Cir. 1993)....................................................................26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schultz,*
 No. 01-0402, 2001 WL 1681973 (D.D.C. Feb. 26, 2001).................................13, 14

*Merrill Lynch v. Amsbury,*
 No. Civ. 00-232-5-MHW, Order ..............................................................15

*Merrill Lynch v. Bradley,*
 756 F.2d 1048 (4th Cir. 1985) ..........................................................26, 27

*Merrill Lynch v. Dutton,*
 844 F.2d 726 (10th Cir. 1988) ................................................................26

*Merrill Lynch v. Hegarty,*
 808 F. Supp 1555 (S.D. Fla. 1992), *aff'd,* 2 F.3d 405 (11th Cir. 1993) (per
 curiam)................................................................................................26

*Merrill Lynch v. Kearney,*
 No. 01-5022, at p. 6 (W.D. Ark. Jan. 25, 2001) .....................................15

*Merrill Lynch v. Kramer,*
 816 F. Supp. 1242 (N.D. Ohio 1992) ......................................................23

*Merrill Lynch v. Sivel,*
 No. MJG-99-171 (D. Md. 1999)..............................................................15

*Merrill Lynch v. Zimmerman,*
 1996 WL 707107 (D. Kan. Oct. 1, 1996)................................................23

*Morgan's Home Equip. Corp. v. Martucci,*
 390 Pa. 618 (1957) (In addition to holding that the employer's customer list
 qualified as a trade secret, the Pennsylvania Supreme Court made clear that it
 is just as much of a violation to take and use such a list through an employee's
 memory as to remove it physically.) ........................................................21

*In the Matter of Next Fin. Group, Inc.,*
 Release No. 349, (June 18, 2008)............................................................16

*Ortho Pharm. Corp. v. Amgen Inc.,*
 887 F.2d 460 (3d Cir. 1989)....................................................................26

*Peabody Coalsales v. Tampa Electric,*
 36 F.3d 46 (8th Cir. 1994).......................................................................26

*Performance Unlimited v. Questar Pub.*,
    52 F.3d 1373 (6th Cir. 1995) ................................................................ 26

*Platinum Mgmt. v. Dahms*,
    285 N.J. Super. 274 (Law Div. 1995) ...................................... 10, 11, 19

*PMS Dist. Co. v. Huber*,
    863 F.2d 639 (9th Cir. 1988) ................................................................ 26

*Raven v. A. Klein & Co.*,
    195 N.J. Super. 209 (App. Div. 1984) ................................................... 9

*Rego Displays, Inc. v. Fournier*,
    119 R.I. 469 (1977) .............................................................................. 22

*Reusch v. Reusch Int'l*,
    479 A.2d 297 (D.C. App. 1984) ........................................................... 22

*Rubel & Jensen Corp. v. Rubel*,
    85 N.J. Super. 27 ................................................................................. 10

*Ruscitto v. Merrill Lynch*,
    777 F. Supp. 1349, *aff'd*, 948 F.2d 1286 (5th Cir. 1991) ..................... 26

*Schuhalter v. Salerno*,
    279 N.J. Super. 504 (App. Div.), *cert. denied*, 142 N.J. 454 (1995) ..... 10

*The Smith Barney Division of Citigroup Global Markets Inc. v. Bonnette*
    (D.N.J. April 26, 2004) .......................................................................... 7

*The Smith Barney Division of Citigroup Global Markets Inc. v. Brahney*,
    No. 04-CIV-2180 (D.N.J. May 10, 2005) ............................................. 7

*The Smith Barney Division of Citigroup Global Markets Inc. v. Fox*,
    No. 04-CIV-1777 (D.N.J. April 19, 2004) ............................................ 7

*The Smith Barney Division of Citigroup Global Markets Inc. v. Goldenberg*,
    No. 04-CIV-2381 (D.N.J. May 24, 2005) ............................................. 7

*The Smith Barney Division of Citigroup Global Markets Inc. v. Grossman*,
    No. 06-CIV-3946 (D.N.J. August 22, 2006) ........................................ 7

*The Smith Barney Division of Citigroup Global Markets Inc. v. Kalodner*,
    No. 05-CIV-4543 (D.N.J. September 19, 2005) .................................... 7

*Solari Indus. v. Malady*,
    55 N.J. 571 (1970) ............................................................................... 11

*Stampede Tool Warehouse v. May,*
  651 N.E.2d 209 (Ill. App. 1995) ................................................................ 22

*Suncoast Tours, Inc. v. Lambert Grp., Inc.,*
  1999 WL 1034683 (D.N.J. Nov. 10, 1999) ................................................ 19

*Teradyne, Inc. v. Mostek Corp.,*
  797 F.2d 43 (1st Cir. 1986) ................................................................... 2, 26

*UBS Financial Services Inc. v. Winsten,*
  No. 05-CIV-3390 (D.N.J. July 7, 2005) ....................................................... 7

*Van Prods. Co. v. Gen. Welding & Fabricating Co.,*
  419 Pa. 248 (1965) ..................................................................................... 22

*Whitmyer Bros., Inc. v. Doyle,*
  58 N.J. 25 (1971) ...................................................................................... 6, 9

**Statutes**

15 U.S.C. § 6801(a) ....................................................................................... 25

15 U.S.C. § 6804 ............................................................................................ 17

18 U.S.C. § 1831, 1836(b) ............................................................................ 17

18 U.S.C. § 1839(5)(B)(i) ............................................................................. 23

*N.J.S.A.* 56:15-2 ............................................................................................ 20

*N.J.S.A,* 56:15-3 ............................................................................................ 23

*N.J.S.A.* 56:15-5 ............................................................................................ 20

New Jersey Trade Secrets Act ......................................................... 19, 20. 22, 23

**Other Authorities**

16 C.F.R. § 313.1 *et seq.* ................................................................................ 17

17 C.F.R. § 248 ......................................................................................... 16, 25

17 C.F.R. § 248.1 *et seq.* ................................................................................ 17

17 C.F.R. § 248.3(t)(1)(ii) .............................................................................. 16

17 C.F.R. § 248.3(u)(2)(C) ............................................................................. 16

65 Fed. Reg. 40,334, 40,343 (2000) .............................................................. 16

Federal Rule of Civil Procedure 65 ................................................................. 1

Federal Rule of Civil Procedure 65(c) ........................................................... 27

FINRA Rule 13200 ........................................................................................... 1

FINRA Rule 13804 ..................................................................................... 1, 27

FINRA Rule 13804(a)(2) ................................................................................. 1

18 U.S.C. at § 1839(5)(B)(i), 1839(5)(B)(ii)(II) ...................................... 18, 20

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") files this Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction. .

## **INTRODUCTION**

Plaintiff Fidelity respectfully moves for the entry of a Temporary Restraining Order and Preliminary Injunction against Defendant pursuant to Federal Rule of Civil Procedure 65. Defendant Michael Giordano ("Giordano" or "Defendant"), a former Fidelity Financial Consultant, has taken and/or used Fidelity's confidential and trade secret customer information that he had access to solely by virtue of his employment with Fidelity. He is using that information to unlawfully solicit Fidelity customers to transfer their business to Giordano at his new employer, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch").

Fidelity and Giordano are required to arbitrate the merits of this dispute under the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200. Accordingly, concurrently with the filing of this Motion for a Temporary Restraining Order and Preliminary Injunction ("Motion"), Fidelity also is filing a Statement of Claim with FINRA Dispute Resolution, Inc., seeking binding arbitration of this dispute pursuant to FINRA Rule 13804(a)(2). Although the merits of this case will be resolved in arbitration before FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain immediate temporary and preliminary injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed. Once the injunction is issued by this Court, an expedited arbitration will be scheduled with FINRA within fifteen (15) days of the entry of the injunction. If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, will be assigned to a standard-track arbitration, which could delay a hearing on the merits for a year or more.

Consequently, the temporary relief Fidelity seeks is required to preserve the *status quo* pending an expedited arbitration hearing and Fidelity's application demonstrates that it has met each element of the *Crowe v. DeGioia*, 90 N.J. 126, 132-34 (1982) standard applicable for an award of such relief. *See e.g., Blumenthal v. Merrill Lynch*, 910 F.2d 1049, 1052 (2d Cir. 1990) ("Arbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute..."); *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986) ("congressional desire to enforce arbitration agreements would frequently be frustrated if the court were precluded from issuing preliminary injunctive relief to preserve the *status quo* pending arbitration").

## FACTUAL BACKGROUND

A.   **Fidelity's Unique Business Model And Its Protection Of Trade Secret Customer Information.**

Fidelity's business model is unique as it follows a lead-based approach.  Declaration of Damon Vartabedian ("Vartabedian Decl."), Exhibit 1, at ¶ 3-6.  It does not have its Financial Consultants make "cold calls," and instead provides its Financial Consultants with assigned customers and leads to develop relationships. *Id.* at ¶ 3. Fidelity requires its Financial Consultants to develop relationships and service its clients based upon these leads. *Id.* at ¶ 6. In part because of its unique business model, Fidelity is not a signatory to the Protocol for Broker Recruiting[1] and

---

[1] The Protocol for Broker Recruiting (the "Protocol") is an agreement among certain financial institutions governing the movement of registered representatives from one Protocol firm to another signatory firm.  The Protocol is a forbearance agreement in which signatories agree that registered representatives moving from one signatory firm to another signatory firm may take certain customer information and solicit customers provided they follow the requirements set forth the Protocol.  The Protocol, by its own terms, applies only to financial firms who are signatories to the agreement. Fidelity is not, and has never been, a signatory to the Protocol. Accordingly, any argument that Giordano was permitted to take Fidelity confidential customer information under the Protocol must be rejected. *See, e.g., Hilliard Lyons v. Clark*, 2007 WL 2589956, *6 (W.D. Mich. Aug. 31, 2007).

does not permit departing employees to take with them trade secret customer information to their new firm. *Id.* at ¶ 10.

Fidelity's lead-based approach focuses on: (a) prospective customers who initiate contact with Fidelity (either by telephone, over the internet, or in person), and (b) current Fidelity customers who experience triggering events. *Id.* at ¶¶ 3-5. Fidelity devotes tens of millions of dollars per year to attracting and retaining customers to Fidelity using this lead-based approach. *Id.* at ¶ 4. Financial Consultants, such as Giordano, are the face of Fidelity and are responsible for developing and sustaining the customer relationships for assigned customers. *Id.* at ¶ 6. It distinguishes Fidelity from its competitors, where individual brokers are responsible for establishing service relationships. *Id.* at ¶ 6.

Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as Giordano, is directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets. *Id.* at ¶ 7. Fidelity has compiled the information through a significant investment, and the information is only known to a limited number of Fidelity employees. *Id.* Fidelity maintains its trade secret customer data in confidence to preserve Fidelity's competitive advantage and to meet its customer expectations. *Id.* at ¶ 8. A competitor might randomly solicit Fidelity customers, but it cannot determine who they are and what service needs they may have without Fidelity's trade secret customer information. *Id.* Fidelity protects the information by using password-protected computers; limiting employee access; maintaining a confidentiality policy; educating and training its employees on privacy and confidentiality; requiring all employees, including Giordano, to sign confidentiality agreements; and prohibiting employees from taking confidential information upon their departure. *Id.* at ¶ 9.

B.    **Giordano Agreed To Preserve The Confidentiality Of Fidelity's Trade Secret Customer Information And Not To Solicit Fidelity Customers**

On January 31, 2012, Giordano signed an Employee Agreement at the outset of his employment.  Declaration of Marina Tranchina ("Marina Decl.") at ¶ 8 (attached as Exhibit 2).  Under the terms of his Employee Agreement, Giordano:

- Acknowledged the confidentiality of Fidelity's records, including Fidelity's customer lists and customer information;

- Promised to use Fidelity's trade secret customer information only in the course of his employment with Fidelity and promised not to divulge the information to third parties;

- Promised to return any of Fidelity's confidential trade secret customer information in his possession to Fidelity upon termination of his employment; and

- Promised not to solicit Fidelity customers he serviced or whose names became known to him through his employment for one year after the termination of his employment with Fidelity.

Trancina Decl., Exhibit D, ¶¶ 1, 3, & 6.  Mr. Giordano then renewed his commitment to the provisions by signing it again in connection with his promotion to become a Financial Consultant in 2015.  Trancina Decl., Exhibit E.  After taking these precautions, Fidelity provided Giordano with access to Fidelity's confidential trade secret information, including confidential customer information on high net worth clients with millions of dollars in invested assets. *Id.* at ¶¶ 10-11.

Giordano resigned on January 12, 2018. *Id.* at ¶ 12.  Shortly after Giordano's resignation, Fidelity reminded him of these obligations and Giordano promised he would comply. *Id.* at ¶ 12.  Fidelity also sent a letter to Giordano which outlined his legal obligations, specifically his promise not to take or use confidential Fidelity information, including information regarding Fidelity customers, and not to solicit Fidelity customers. *Id.*, Exhibit F.

C.   **Giordano Solicits Customers and Misappropriates Fidelity's Trade Secret Customer Information**

Despite his contractual obligations and his obligations under New Jersey and federal law, Giordano has used and/or disclosed Fidelity's trade secret customer information in order to divert Fidelity clients to his new firm, Merrill Lynch.

Fidelity has received a number reports that Giordano is soliciting customers and attempting to induce them to transfer to his new employer. Specifically, at least five clients have reported that Mr. Giordano contacted them in the few days since his resignation regarding his new employment with Merrill Lynch. Significantly, one of those clients reported that Mr. Giordano called the client and "asked for his business". The client said that Mr. Giordano gave him his contact information, including his cell phone number, for him to call him in the future. The client then volunteered to Fidelity's employee that he had no intention of leaving Fidelity, even though Mr. Giordano had asked for his business. Another client similarly stated that Mr. Giordano had contacted him but that client also volunteered that he was not going to leave Fidelity, indicating that the client believed that Mr. Giordano had been trying to obtain that client's business. *Id.* at ¶ 16.

The only way Giordano could have contacted these individuals and known they were Fidelity customers was by exploiting his knowledge of and access to Fidelity's trade secret confidential customer information. He is not permitted to use this information or disclose this information to Merrill Lynch, in any form, even if he does so by utilizing his memory, because regardless of form the effect remains the same: he has misused the information for his own benefit and that of a direct competitor. This conduct violates Giordano's Employee Agreements, and

federal and New Jersey trade secret law.  Fidelity asks for the Court's assistance in protecting that information and stopping Defendant's knowing and intentional wrongful conduct.

## ARGUMENT

I.  **The Standards for Granting Injunctive Relief Strongly Favor Granting Fidelity Relief in this Case**

Fidelity is entitled to injunctive relief because Fidelity can demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the Fidelity's favor, and (4) that an injunction is in the public interest. *See Crowe,* 90 N.J. at 132-134; *Martinez v. New York,* 2008 WL 343556 (D.N.J. 2008).

The importance of injunctive relief in cases like this one involving solicitation, misuse of customer lists, and other confidential customer information and damage to goodwill and reputation has been stressed by New Jersey and other courts. *Lamorte Burns & Co. v. Walters,* 167 N.J. 285, 298 (2001) (service business' customer lists "afforded protection as trade secrets"). *Accord e.g., Kaye v. Rosefielde,* 223 N.J. 218 (2015); *Whitmyer Bros., Inc. v. Doyle,* 58 N.J. 25, 33 (1971) ("[E]mployer has a patently legitimate interest in protecting his trade secrets as well as his confidential business information and he has an equally legitimate interest in protecting his customer relationships"); *AYR Composition, Inc. v. Rosenberg,* 261 N.J. Super. 495, 504 (App. Div. 1993) (company's customer names and addresses are protectable property); *J.H. Renard; Inc. v. Sims,* 312 N.J. Super. 195, 204 (Ch. Div. 1998) (legitimate interest at stake because defendant had plaintiff's client list and other information). *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dewey,* 2004 WL 1515502 (Mass. Super. June 30, 2004) ("Injunctive relief is warranted to prevent misappropriation and unlawful use of confidential records such as the customers' names and addresses in circumstances in which the former employee and employer entered into a contract that restricts the former employee's use of such material following his employment."); *Charles*

6

*Schwab & Co., Inc. v. Karpiak,* 2007 WL 136743 (E.D. Pa. Jan. 12, 2007) (awarding preliminary injunction against former broker who prior to resigning prepared a spreadsheet of customer information and after resigning sent letter to former firm's clients); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano,* 85 F. Supp. 2d 491 (E.D. Pa. 2000) (awarding preliminary injunction against former broker who prior to his resignation removed customer identifying information and after his resignation contacted former firm's clients purportedly to "announce" his move).

This Court has repeatedly recognized an emp *J.P. Morgan Chaser Bank, N.A. v. Eosso,* No. 2:15-cv-06182 (D.N.J. August 14, 2015); *The Smith Barney Division of Citigroup Global Markets Inc. v. Grossman,* No. 06-CIV-3946 (D.N.J. August 22, 2006); *The Smith Barney Division of Citigroup Global Markets Inc. v. Kalodner,* No. 05-CIV-4543 (D.N.J. September 19, 2005); *UBS Financial Services Inc. v. Winsten,* No. 05-CIV-3390 (D.N.J. July 7, 2005); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lascelle,* No. 05-CIV-2037 (D.N.J. April 18, 2005); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Miserendino,* No. 05-CIV-1849 (D.N.J. April 11, 2005); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Bishop,* No. 04-CIV-5567 (D.N.J. Nov. 15, 2004); *The Smith Barney Division of Citigroup Global Markets Inc. v. Goldenberg,* No. 04-CIV-2381 (D.N.J. May 24, 2005); *The Smith Barney Division of Citigroup Global Markets Inc. v. Brahney,* No. 04-CIV-2180 (D.N.J. May 10, 2005); *The Smith Barney Division of Citigroup Global Markets Inc. v. Bonnette,* (D.N.J. April 26, 2004); *The Smith Barney Division of Citigroup Global Markets Inc. v. Fox,* No. 04-CIV-1777 (D.N.J. April 19, 2004).

Moreover, courts across the country have regularly enforced Fidelity's contract and trade secret claims in departing broker cases. Fidelity vigorously seeks to protect its contract rights and confidential, trade secret information. Since 2003, Fidelity has sought and obtained injunctive relief to protect its confidential and trade secret information in numerous similar cases: *Fidelity*

*Brokerage Serv. LLC v. Vee*, No. 12-1986 (D. Colo. 2012); *Fidelity Brokerage Serv. LLC v. McNamara*, No. 11-1092, 2011 WL 2117546 (S.D. Cal. May 27, 2011); *Fidelity Brokerage Serv. LLC v. Fassenfeld*, No. 013945/11 (NY Sup. Ct. 2011); *Fidelity Brokerage Serv. LLC v. Wilder*, No. 11-37296 (Mass. Super. Ct. 2011); *Fidelity Global Brokerage Group v. Gray*, No. 10-1255 (E.D. Va. 2010); *Fidelity Global Brokerage Group v. Beatty*, No. 652147 (NY Sup. Ct. 2010; *Fidelity Brokerage Serv. LLC v. Rousseaux*, No. 03- 01319 (D. Md. 2003; *Fidelity Brokerage Serv. LLC v. Donovan*, No. 03-2286 (Mass Super. Ct. 2003); *Fidelity Brokerage Serv. LLC v. Alexopoulos*, No. 03-5362 (Mass. Super. Ct. 2003); *Fidelity Brokerage Serv. LLC v. Jones*, No. 04-3478 (S.D. Tex. 2004); *Fidelity Brokerage Serv. LLC v. Parker*, No. 04-1027 (S.D. Cal. 2004); *Fidelity Brokerage Serv. LLC v. Johnson*, No. A04-CA-662-SS (W.D. Tex. 2004); *Fidelity Brokerage Serv. LLC v. Sanchez*, No. 08-03863 (C.D. Cal. 2008); *Fidelity Brokerage Serv. LLC v. Stockwell*, No. 05-0455 (Mass. Super. Ct. 2005; *Fidelity Brokerage Serv. LLC v. Rupp*, No. 05-00083 (D.N.H. 2005; *Fidelity Brokerage Serv. LLC v. Umstead*, No. 07-347 (E.D. Va. 2007); *Fidelity Brokerage Serv. LLC v. Vance*, No. 07-1230 (C.D. Cal. 2007); *Fidelity Brokerage Serv. LLC v. Downey*, No. 08-1637 (JFB) (E.D.N.Y. 2008); and *Fidelity Brokerage Serv. LLC v. Franz*, No. 8/9564 (N.Y. Sup. Ct. 2008). In fact, a court in California recently enforced the same agreement and entered injunctive relief prohibiting the Fidelity Financial Consultant from further violating his contract and soliciting Fidelity clients. *See Fidelity Brokerage Serv., LLC v. Rocine*, Case No. 417-cv-4993-PJH (N.D. Cal. 2017)(attached as Exhibit 3). In each instance, Fidelity successfully obtained an injunction to protect Fidelity's confidential and trade secret information and to stop ongoing solicitation of its customers.

## II.   Fidelity Is Likely To Succeed On The Merits on Its Breach Of Contract and Trade Secrets Claims

Fidelity is entitled to an injunction because it is likely to succeed on the merits of its breach of contract and trade secrets claims.

### A.   Fidelity's Breach of Contract Claim

Fidelity is likely to succeed on the merits of its breach of contract claim because the restrictive covenants at issue are enforceable, the evidence shows that Giordano solicited multiple Fidelity customers, and he violated his contractual confidentiality obligations in doing so.

#### 1.   Giordano's Agreement is Enforceable Under New Jersey Law

Reasonable non-solicitation provisions are valid and enforced in New Jersey.  Under New Jersey law, a non-solicitation provision is reasonable if it: (1) protects the legitimate interests of the employer, (2) is reasonable in time and geographic scope and imposes no undue hardship on the employee, and (3) is not injurious to the public.  *Karlin v. Weinberg*, 77 N.J. 408, 417 (1978) (citing *Solari Indus. v. Malady*, 55 N.J. 571, 576 (1970); *Whitmyer Bros. Inc. v. Doyle*, 58 N.J. 25, 32-33 (1971)); *Raven v. A. Klein & Co.*, 195 N.J. Super. 209, 213 (App. Div. 1984); *see also Maw v. Advanced Clinical Commc'ns,* 179 N.J. 439, 447 (2004) (noting that this three-part test "has now become an accepted part of the common law, not only in New Jersey but also in other jurisdictions around the country").  The provisions in Giordano's Fidelity Agreements meet all three criteria.

#### a.   Fidelity's Interests Are Legitimate and Protectable

Fidelity has a well-recognized interest in its customer relationships that may validly be protected by post-employment restrictions.  *See, e.g., Whitmyer*, 58 N.J. at 33 ("the employer has a patently legitimate interest ... in protecting his customer relationships"); *Karlin*, 77 N.J. at 417

(same); *A.T. Giordano & Co. v. Donovan*, 216 N.J. Super. 426, 432-33 (App. Div. 1987) (reversing denial of, *inter alia*, "an order enjoining [defendant former employee] from soliciting business from plaintiff's customers," and holding that plaintiff's interest in maintaining customer relationships outweighs the public's "right to an unrestricted choice of management consultants"); *Platinum Mgmt. v. Dahms*, 285 N.J. Super. 274, 294 (Law Div. 1995). In *A.T. Giordano*, for example, the court found enforceable an agreement providing the defendant could not "directly or indirectly, for yourself or any other Business Entity, solicit from, or render any services to ... Any Business Entity which has been a Customer of the Company at any time or from time to time during the two (2) year period prior to the date of termination of your employment with the Company." 216 N.J. Super. at 428.

### b. The Defendant's Agreements are Reasonable in Time and Geographic Scope and Impose no Undue Hardship on the Employee

Giordano's Agreements are also narrowly tailored to protect Fidelity's legitimate business interests. His Agreements merely preclude him from using confidential information to solicit customers, and soliciting or inducing customers he serviced at Fidelity. New Jersey courts regularly enforce similar restrictions for two and even more years. *See, e.g., Mailman, Ross v. Edelson,* 183 N.J. Super. 434,441 (1982)("two years [is] a term generally held to be reasonable"); *Cmty. Hosp. Grp. v. More*, 365 N.J. Super. 84, 105 (App. Div. 2003) ("covenants containing a two-year period of restriction have generally been upheld as reasonable by our courts"), *aff'd in part & rev'd in part on other grounds*, 183 N.J. 36 (2005); *Schuhalter v. Salerno*, 279 N.J. Super. 504, 513 (App. Div.) (enforcing two-year covenant as "a modest imposition"), *cert. denied*, 142 N.J. 454 (1995); *A.T. Giordano*, 216 N.J. Super. at 431; *Karlin v. Weinberg*, 148 N.J. Super. 243, 245 (App. Div. 1977) (five-year restriction enforceable), *aff'd*, 77 N.J. 408 (1978); *Rubel & Jensen Corp. v. Rubel*, 85 N.J. Super. 27, 35 (App. Div. 1964) (same).

No geographical restriction is necessary here, because Fidelity is simply seeking to protect its own, existing customer relationships. Giordano remains free to work for a competitor and to market securities products and services to non-Fidelity customers in the same geographic area. *See, e.g., Solari*, 55 N.J. at 586 (holding enforceable a restraint against defendant "dealing with any of [plaintiff] Solari's actual customers or prospective customers in the United States with whom he had substantial dealings on Solari's behalf while in Solari's employ"); *Platinum Mgmt.*, 285 N.J. Super. at 299 ("the failure to restrict the geographical area is not significant, since the provision essentially sought to protect existing customer relationships rather than a territorial sphere of influence").

Giordano's voluntary resignation from his employment with Fidelity further precludes a finding of undue hardship. "[W]here the breach results from the desire of an employee to end his relationship with his employer," the court "should be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself." *Karlin*, 77 N.J. at 423-24; *see also, e.g., Cmty. Hosp. Grp. v. More*, 183 N.J. 36, 59 (2005 ("the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play"). Moreover, "[o]rdinarily a showing of personal hardship, without more, will not amount to an 'undue hardship' such as would prevent enforcement of the covenant." *Karlin*, 77 N.J. at 424; *see also id.* at 417 n.3 ("Although the affidavits show that defendant will suffer adverse financial consequences as a result of enforcement of the covenant, a mere showing of personal hardship does not amount to an 'undue hardship' that would prevent enforcement of the covenant").

Giordano's Employee Agreements with Fidelity are intended to protect against his unfair exploitation of customer relationships and trade secrets acquired during his employment. The restriction is narrowly tailored to be no more burdensome than necessary to protect Fidelity's

legitimate interests.  The Agreements do not prevent him from competing in the industry, but rather prevent him only from soliciting Fidelity customers or using Fidelity's confidential information to do so.  Numerous courts have found that this type of covenant with this scope does not present an undue hardship on a departing employee.

### c.   Giordano's Agreements are not injurious to the public.

Enforcing Giordano's non-solicitation agreements will not harm the public because customers are free to contact him.  He simply cannot solicit customers he formerly serviced or use confidential information to do so.  The issuance of an injunction will also "serve the compelling public interests of enforcing valid contractual provisions and protecting business investments, as well as confidential customer information."  *Charles Schwab & Co. v. Karpiak*, 2006 U.S. Dist. LEXIS 92763 at *35-36 (E.D. Pa. 2006).  Accordingly, the non-solicit agreements meet all three elements of reasonableness under New Jersey Law.

### d.   Giordano Breached His Agreements

Giordano breached the non-solicitation and confidentiality provisions of his Agreements.

### (i)   Giordano Solicited Multiple Fidelity Customers

When Giordano resigned from Fidelity, he was reminded that he was bound by his Agreements and he was again reminded in the letter that was sent to him immediately upon his resignation. Tranchina Decl., Exhibit D, ¶ 6. Nevertheless, within the very first few days following his resignation, Giordano began soliciting Fidelity's customers, including multiple high net worth customers.   Trancina Decl. at ¶16.

### (ii)   Giordano's Contacts Were Solicitations

Fidelity anticipates that Giordano may argue that he has not violated the non-solicitation clause in the Employee Agreements, because – he will claim – he allegedly has "merely

announced" his new employment in his multiple contacts with Fidelity clients. This semantic defense should be rejected for multiple reasons.

First, the solicitous nature of Giordano's contacts is demonstrated by the fact that a client reported that Giordano "asked for his business". That client and another client also volunteered to the Fidelity employees that they spoke with that they were not going to transfer to Giordano. The clear import that they took from Giordano's calls was that he was asking them to transfer. Giordano also gave out his personal cell phone number and encouraged Fidelity clients to call him in the future.

Second, the targeted nature of Defendant's contacts with Fidelity's clients about his new employment with Merrill Lynch (a Fidelity competitor) illustrates the solicitous intent behind his communications. Federal courts throughout the country have rejected the same semantic argument under similar facts and entered injunctive relief against the departing financial advisors. For instance, in *Charles Schwab & Co. v. McMurry*, the federal court found that targeting an alleged "announcement" directly through the mail to specific clients the employee knew from his prior employment constitutes a solicitation:

> The Court also notes that the mere sending of announcements may constitute solicitation. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McClafferty*, 287 F. Supp. 2d 1244, 1248 (D. HI. 2003) (noting that announcements directed at a client list, and sent as a matter of professional courtesy, can violate non-compete provisions); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schultz*, No. 01-0402, 2001 WL 1681973, *3 (D.D.C. Feb. 26, 2001) ….

*Charles Schwab & Co., v. McMurry*, 2008 U.S. Dist. LEXIS 104140 (M.D. Fla. Dec. 23, 2008).

In *Merrill Lynch v. Schultz*, 2001 WL 1681973, *3 (D.D.C. 2001), the District of Columbia federal court sided with Giordano's new employer, Merrill Lynch, and rejected a similar argument by Merrill Lynch's former financial consultant, who was asserting that his telephone calls to

Merrill Lynch clients did not amount to solicitation in violation of Merrill Lynch's agreement. The court emphasized that it is the targeted nature of the contact that renders it a solicitation:

> Despite the "announcement" label the defendant places on it, such initiated, targeted contact is tantamount to solicitation because **there is no reason to believe that a customer on the receiving end of such a phone call does not assume that the broker wishes for him to transfer his account**. A genuine announcement, by contrast, has a broader, general nature, such as a newspaper or trade paper advertisement. Such an announcement simply does not have the same level of intrusive, proactive communication of such tacit expectations.

*Id.* (emphasis added). *See also Merrill Lynch v. Napolitano*, 85 F. Supp. 2d 491 (E.D. Pa. 2000) (noting the former Merrill Lynch employee "lamely assert[ed] that his communications with clients in the immediate aftermath of his resignation from Merrill Lynch did not amount to wrongful 'solicitation'"); *JP Morgan Chase v. Clark*, 2009 U.S. Dist. LEXIS 89926, *4 (E.D. Mich. 2009) (rejecting defendants' argument that the purpose of contacts with clients "was only to announce the cessation of employment with the Plaintiffs, but not to solicit business."); *Charles Schwab v. Karpiak*, 2006 U.S. Dist. LEXIS 92763 at *35-36 (E.D. Pa. 2006) ("[Defendant] asserts that his communications with Schwab clients immediately after his resignation from Schwab amounted to 'notification' rather than 'solicitation'. I find that the arbitrators probably will conclude that his actions encouraged these clients to follow him to RBC Dain.").

In *Compass Bank v. Hartley*, 430 F. Supp.2d 973 (D. Ariz. 2006), the court emphasized that targeted communications to former clients about new employment constitute solicitations. Hartley's conduct was even milder than Giordano's conduct in this case because he merely contacted clients by mail, but refrained from also calling them. Nonetheless, the court found his so-called "announcement" mailing to be a solicitation. Hartley's mailing stated: "Effective 12.01.05 Kenneth R. Hartley, Jr., CFA, has joined our firm as: President and Chief Investment Officer." *Id.* at 981. The mailing also contained Hartley's telephone numbers, email address, and

the address of his new employer. *Id.* The court found this "constitutes a solicitation not only because it was a targeted mailing, but because it contained contact information initiating customers to call/e-mail/write Hartley." *Id.* The court observed: "Hartley could have generally informed his customers of his resignation, such as through a newspaper or trade paper advertisement containing a non-specific impersonal announcement to former clients." Id. at 982 n. 12. *See also Merrill Lynch v. McClafferty*, 287 F. Supp. 2d 1244, 1248 (D. Hi. 2003) (announcements directed at a client list obtained while at employer violate non-solicitation agreement); *Merrill Lynch v. Amsbury*, No. Civ. 00-232-5-MHW, Order expanding TRO and transcript of May 8, 2000 hearing, at p. 3 (D. Idaho 2000) ("[T]he initiation of telephone calls are clearly in solicitation of business. I don't know how one could end a phone call advising a customer of the changed [employment] relationship without a solicitation occurring. I think in the real world it is impossible."); *Merrill Lynch v. Sivel*, No. MJG-99-171 (D. Md. 1999) (ruling that a contact directed at a client formerly serviced by the defendant, even in the case of a written purported "announcement," was a "solicitation" and thus was in violation of the no-solicitation clause of the defendant's agreement with Merrill Lynch); *Merrill Lynch v. Kearney*, No. 01-5022, at p. 6 (W.D. Ark. Jan. 25, 2001) ("'solicit' means 'to move to action' or 'to serve as an urge or incentive.' *Webster's Third New International Dictionary*. The Court can divine no rational explanation for defendant's contacts with his clients - - made over the weekend immediately after resigning from one brokerage firm and taking employment with another - - except to move those clients to action in following him to the new brokerage firm.").

Therefore, the Court should reject any attempt by the Defendant to claim that he was not soliciting or inducing Fidelity clients to transfer their accounts when he called them as soon as he joined his new firm.

### (iii)   Giordano Used Fidelity's Confidential Client Information

Giordano agreed that except as necessary to perform his duties for Fidelity, he would not use Fidelity's confidential client information, including Fidelity's customer list and customers' personal information.  Trachina Decl., Ex. D, ¶ 1.  Yet, by soliciting Fidelity customers and attempting to induce customers to transfer to Merrill Lynch, Giordano did precisely what he promised not to do.

Moreover, the confidential nature of Fidelity's client information is not just a matter of contract.  Rather, applicable federal law makes clear that customer names, addresses, and other contact information are entitled to protection.  The SEC's Regulation S-P, titled "Privacy of Consumer Financial Information" provides privacy protection for the non-public information ("NPI") of financial services customers.  17 C.F.R. § 248.  NPI includes: "Any list, description, or other grouping of consumers (*and publicly available information pertaining to them*) that is derived using any personally identifiable financial information that is not publicly available information."  17 C.F.R.  § 248.3(t)(1)(ii) (emphasis added).  "Personally identifiable financial information" includes "[t]he fact that an individual is or has been one of [a broker-dealer's] customers or has obtained a financial product or service from [a broker-dealer]."  17 C.F.R. § 248.3(u)(2)(C).   Client names, telephone numbers and addresses also constitute NPI under Regulation S-P.  *See* Privacy of Consumer Financial Information (Regulation S-P), 65 Fed. Reg. 40,334, 40,343 (2000) (noting that the SEC rejected arguments that it should not regard customer names, addresses and telephone numbers to constitute NPI); *see also In the Matter of Next Fin. Group, Inc.*, Release No. 349, *5 (June 18, 2008) (NPI includes customer names, addresses and telephone numbers).

Therefore, even if Giordano has recreated confidential customer information utilizing his memory of facts learned during his employment at Fidelity, the information constitutes NPI and is entitled to confidentiality protections under Regulation S-P.  *See, e.g., Ameriquest Mortgage Co. v. Washington State Office of Atty. Gen.*, 170 Wash. 2d 418, 432 (Wash. 2010) ("[T]he definition of 'personally identifiable information [which is a subset of NPI]' relates to 'information' and not to the vessel of the information (for example, a document or an email.)").[2]  Accordingly, Giordano breached the Agreements by soliciting Fidelity's customers and by improperly using Fidelity's confidential information.

**B.    Fidelity's Trade Secret Claim**

Fidelity is also likely to succeed on the merits of its trade secret claim because it can prove under state and federal law that it: (1) possessed a trade secret, and (2) Giordano misappropriated and/or used that trade secret in violation of the DTSA and New Jersey state law.

**1.    Fidelity's Customer List is a Protectable Trade Secret**

Fidelity's customer list, including the names, addresses, telephone numbers, financial needs, and account information of its customers, qualifies for trade secret protection under federal and state law.  Accordingly, even absent the confidentiality and non-solicitation restrictions set forth above in Defendant's Agreements, injunctive relief is appropriate to protect against misuse of Fidelity's trade secret customer information.

The Defend Trade Secrets Act ("DTSA" or the "Act") provides a federal cause of action for misappropriation of trade secrets that are related to a product or service used in, or intended for

---

[2] In *Ameriquest*, the Washington Supreme Court addressed the definition of NPI under the FTC's counterpart to the SEC's Regulation S-P.  The FTC and SEC rules were implemented pursuant to the same federal statute, which required the agencies to "consult and coordinate" with one another to assure that their regulations "are consistent and comparable." 15 U.S.C. § 6804. Consequently, the FTC and SEC rules are virtually identical. *Compare* 16 C.F.R. § 313.1 *et seq. with* 17 C.F.R. § 248.1 *et seq.*

use in interstate commerce. *See* 18 U.S.C. § 1831, 1836(b). The Act defines a trade secret to include "compilations" of "all forms and types of financial, business, [or] economic … information" if the owner takes reasonable steps to keep the information secret, and the information is valuable because it not generally known to others who can profit from its use. *Id.* § 1839(3)(A)-(B). If the alleged "trade secret" meets these standards, the Act protects the information "whether tangible or intangible". *Id.* § 1839(3).

Fidelity's customer list is likewise a trade secret under New Jersey state law. "The [New Jersey Trade Secrets] Act defines 'trade secret' broadly as 'information without regard to form' that derives independent economic value' from not being known to others who can obtain economic value from its disclosure or use and that is the subject of reasonable efforts to maintain its secrecy." *Diversified Indus., Inc. v. Vinyl Trend, Inc.*, 2014 WL 1767471 (D.N.J. 2014) (*citing N.J.S.A*, 56:15-3 and *StrikeForce Techs., Inc. v. WhiteSky, Inc.*, 2013 WL 3508835 at *8 (D.N.J. July 11, 2013)).

The facts in this case demonstrate that Fidelity's customer information is entitled to trade secret protection. The identities of the customers assigned to Giordano at Fidelity are closely guarded and not known to Fidelity's competitors, such as Merrill Lynch. Vartabedian Decl. at ¶¶ 8-9. This is because the list gives Fidelity a competitive advantage over its competitors, such as Merrill Lynch, who cannot target its customers. *Id.* at ¶ 8. This list is not publicly available and is only known to a limited number of Fidelity employees. *Id.* at ¶ 7. Merrill Lynch would unfairly benefit from this list because it would enable it to market to a pre-selected elite group of customers and target their financial products, services and efforts without the need to spend any time, money or resources to identify and develop such customers. Moreover, Fidelity's trade secret is not simply a list of names. It includes far more information, including contact information and

financial information such as customer statements, investment goals and history, assets, income, and net worth, all of which would be very valuable to a competitor in the financial industry, such as Merrill Lynch.  Tranchina Decl. at ¶ 7.

Further, any claim that the information that Defendant used was publicly available is misleading.  Even if some of the customer information was available in publicly-available sources, there is no public directory of persons interested in financial services or anything that identifies anyone as a customer of Fidelity.  It was only by learning their names by working at Fidelity and having their identities disclosed to him that Giordano was then to look them up in public sources, therefore the information is still a trade secret. *Suncoast Tours, Inc. v. Lambert Grp., Inc.,* 1999 WL 1034683, at *8 (D.N.J. Nov. 10, 1999) ("[E]ven if defendants could assemble a similar list of customers using public sources, it could not assemble a list of recent Suncoast/Lambert customers through such sources."); *Platinum Mgmt., Inc. v. Dahms,* 285 N.J. Super. 274, 295 (Ch. Div. 1995) ("[a]lthough the customers' names may be listed in [trade directories and other publications], the fact that they are customers of [plaintiff] is not.").

Because its trade secret customer information is so valuable, Fidelity takes numerous steps to preserve the confidentiality of its trade secret information.  Vartabedian Decl. at ¶ 9.  Fidelity requires all of its employees to sign confidentiality agreements.  *Id.*  It has policies and procedures in place to preserve and safeguard confidential customer information.  *Id.*  For example, Fidelity regularly trains and educates its employees on their obligations to protect customer information, and password protects its customer data on its computers.  *Id.*  Finally, Fidelity does not permit its employees to take, use, or disclose any customer information when they leave Fidelity.  *Id.*

### 2. Giordano's Actions Violate Federal and State Law

Giordano has violated both the New Jersey Trade Secrets Act and the DTSA by taking and using Fidelity's trade secret customer information to solicit clients on behalf of himself and a direct competitor.  Under New Jersey law, "misappropriation" includes "disclosure or use of a trade secret of another without express or implied consent of the trade secret owner by a person who: (a) used improper means to acquire knowledge of the trade secret...." *N.J.S.A.* 56:15-2. The New Jersey Trade Secret Act further defines "improper means" to include "breach...of an express or implied duty to maintain the secrecy of, or to limit the use or disclosure of, a trade secret...." *Id.* Therefore, Giordano may not use as a defense to the trade secret misappropriation claim that proper means existed when the trade secret was misappropriated. *N.J.S.A.* 56:15-5.

"Misappropriation" is similarly defined under the DTSA as the acquisition of a trade secret by improper means or the unconsented disclosure or use of a trade secret by a person who has a duty to maintain the trade secret's secrecy or to limit its use. *See* 18 U.S.C. at § 1839(5)(B)(i), 1839(5)(B)(ii)(II).  The acts protects trade secrets "whether tangible *or intangible*." *Id.* at § 1839(3).  Thus, it protects intangible trade secrets stored in Giordano's memory that he misuses in violation of his confidentiality agreement and duty to maintain their secrecy.

The court in *Fidelity v. Rocine* addressed the exact same argument by a former Fidelity Financial Consultant who claimed that the information that he took in his memory was no longer entitled to trade secret protection.  The court rejected this argument stating:

> The court finds it disingenuous, at best, for Rocine to claim that he did not "use" Fidelity's "Confidential Information" to solicit Fidelity customers because all he did after his departure was put together a list of customers "from memory" and then look up their contact information in JPMorgan's account databases or in publicly-available databases.  The fact remains that that he would not have known whose name to look up had he not first obtained the names during the course of him employment at Fidelity.

*Fidelity Brokerage Serv., LLC v. Rocine,* Exhibit 4, at page 8.

Likewise, although the DTSA is a fairly recently enacted statute and there are not many decisions applying it, the United States District Court in Colorado addressed this exact issue in the same context and found a violation of the DTSA. In *First W. Capital Mgmt. Co. v. Malamed*, 16-CV-1961-WJM-MJW, 2016 WL 8358549, at *8 (D. Colo. Sept. 30, 2016), the defendant claimed that he did not physically misappropriate and keep the plaintiff's trade secret customer list and trade secret information, but was solely acting from memory. The court found this to be of no consequence:

> It is enough that Malamed remembers the names of many FWCM clients, and that he can look up their contact information. Furthermore, as noted, he almost certainly remembers far more than the identity of clients. It would be difficult to conceive of him not remembering most clients' management fee percentage, or at least to have a good guess. Malamed also likely remembers many clients' preferences regarding risk, time horizon, communication style, and so forth. He may also remember, at least roughly, how much money some clients have entrusted to FWCM. All of these are informational assets that, in the financial management industry, a competitor would find especially valuable. Thus, the Court finds that Malamed, at a minimum, remembers trade secret information, even if he does not possess any trade secrets in physical or digital form.

*Id. See also Latuszewski v. VALIC Financial Advisors, Inc.*, 393 Fed. Appx. 962, 965-66 & n.5 (3d Cir. 2010) (in a case involving the financial advisory industry, the court held that "whether th[e] information was embodied in written lists or committed to memory is…of not significance; in either case the data are entitled to protection").

The overwhelming majority of jurisdictions that have considered this issue have likewise ruled that misappropriation by memory is misappropriation. *See, e.g., Al Minor & Assoc. v. Martin*, 881 N.E.2d 851 (Ohio 2008) (Information that constitutes a trade secret does not lose its character as a trade secret if it has been memorized; it is the information that is protected, "regardless of the manner, mode, or form in which it is stored – whether on paper, in a computer,

in one's memory, or in any other medium."); *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618 (1957) (In addition to holding that the employer's customer list qualified as a trade secret, the Pennsylvania Supreme Court made clear that it is just as much of a violation to take and use such a list through an employee's memory as to remove it physically.); *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d 427 (1999); *Allen v. Johar, Inc.*, 308 Ark. 45 (1992); *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835 (1972); *Van Prods. Co. v. Gen. Welding & Fabricating Co.,* 419 Pa. 248 (1965); *M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624 (Tex. App. 1992); *Cent. Plastics Co. v. Goodson*, 1975 Okla. 71 (1975); *Rego Displays, Inc. v. Fournier*, 119 R.I. 469 (1977); *Reusch v. Reusch Int'l*, 479 A.2d 297 (D.C. App. 1984) ("Once a customer list is afforded trade secret protection, it is immaterial whether the list was taken or copied or whether it was memorized."); *Stampede Tool Warehouse v. May*, 651 N.E.2d 209, 217 (Ill. App. 1995) ("That taking does not have to be physical taking by actually copying the names. A trade secret can be misappropriated by physical copying or by memorization."); *Diamond Power Internaitonal v. Clyde Bergemann, Inc.,* 2005 U.S. Dist. LEXIS 12493 (N.D. Ga. Jan. 5, 2005) (Trade secrets are not transmogrified into non-secrets simply because they are conveyed from a disloyal former employee's memory rather than from some other source).

At this time, Fidelity does not know whether Giordano misappropriated physical records, or took pictures of customers profile screens on his Fidelity computer, or whether he is recreating Fidelity's customer information from memory. Under the DTSA and New Jersey law, it is of no consequence whether Giordano took a physical or digital copy of Fidelity's customer information or whether he exploited his "memory" of Fidelity's customers. Whichever he did, he did *in order to solicit the business of Fidelity's customers.* His *misuse* of the information is crucial. He did not merely go to work for Merrill Lynch and perform to the best of his abilities. He went a step further

and actively *misused* and, therefore, *misappropriated* Fidelity's trade secret information for his own benefit and on behalf of Fidelity's competitor.

His actions amount to misappropriation under the DTSA and the New Jersey Trade Secrets Act because he has violated his duty to maintain confidentiality of Fidelity's trade secrets , and has used and/or disclosed them in violation of his duty to maintain secrecy. 18 U.S.C. § 1839(5)(B)(i); 1839(5)(B)(ii)(II); 1839(6).   The New Jersey Trade Secrets Act expressly contemplates the entry of injunctive relief in cases such as this (i.e., where an employee has violated a contract with his former employer to preserve the confidentiality of the employer's information) to protect against ongoing acts of misappropriation. N.J.S.A. 56:15-3.  Therefore, Fidelity is likely to succeed on the second element of its trade secrets claim as well.

**III.   Fidelity Has No Adequate Remedy at Law**

Without an injunction, Fidelity will suffer irreparable harm as a result of Giordano's wrongful conduct.  Courts consistently find that the misappropriation of customer information and attempts to divert customer relationships present an immediate threat of irreparable harm for which money damages are inadequate or incalculable. "Where a party demonstrates both the likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the issuance of an injunction." *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 532-33 (D.N.J. 1999) (internal quotations omitted).

The Defendant's wrongful acts also cause irreparable harm because they undermine the trust that Fidelity's customers place in it to maintain customer information in confidence. *See Merrill Lynch v. Kramer*, 816 F. Supp. 1242, 1247 (N.D. Ohio 1992); *Merrill Lynch v. Zimmerman*, 1996 WL 707107 at *2 (D. Kan. Oct. 1, 1996) ("without a TRO, the plaintiff will lose good will from certain clients when they discover that their supposedly confidential

information was stolen"). Harm to Fidelity's goodwill with its clients and diminution of its reputation for scrupulously safeguarding the privacy of clients' personal and financial information - especially in this day and age of news cycles rife with reporting of data breaches and the related threat posed to consumers nationwide — is not readily capable of being remedied by monetary damages. *See Community Hospital Group, Inc. v. More,* 365 N.J. Super. 84 (App. Div. 2003) (explaining that harm to a hospital's reputation "for being capable of maintaining a sufficient patient or referral base could have a chilling effect on its ability to recruit" and "any diminution of its reputation regarding these types of services is not readily capable of being remedied by monetary damages"), reversed in part on other grounds, remanded, 183 N.J. 36 (2005).

Giordano's conduct threatens to irreparably harm Fidelity and will inflict ongoing irreparable harm Fidelity if not stopped immediately. Tranchina Decl. at ¶ 11. Fidelity faces the loss of goodwill with these customers, and if Defendant's conduct is allowed to continue unabated, Fidelity faces the loss of future business or referrals, and further faces loss of its customers' trust and confidence in securing inherently-private information. This harm cannot be calculated with precision and cannot be adequately compensated. *Id.* Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. *Id.* Thus, customers understandably become concerned when former Fidelity employees, such as Giordano, have access to their information and are using it to solicit their business at a new and different brokerage institution as has been reported in this case. Vartabedian Decl. at ¶ 16. In other words, the damage to Fidelity's customer relationships is already occurring, is ongoing and incalculable, as Fidelity cannot put a price on the value of its customer relationships

or the damage caused when Giordano took and improperly misused confidential and trade secret customer information for his benefit and on behalf of a competitor.  Tranchina Decl. at ¶ 11.

## IV.   The Balance of Interests Favors Fidelity and Granting Injunctive Relief Serves the Public Interest

The benefit of injunctive relief to Fidelity would far outweigh any detriment to the Defendant, and it would serve the public interest.  An injunction would protect Fidelity's goodwill, business reputation, and contract rights.  It would also promote the public interest by protecting Fidelity's trade secret client information and the confidentiality of Fidelity's customers' records. As noted above, the public interest in privacy is so compelling that the SEC, acting pursuant to a congressional directive in the GLBA, implemented Regulation S-P, titled "Privacy of Consumer Financial Information." 17 C.F.R. § 248.  The GLBA declared that it is "the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).  Against these compelling interests favoring injunctive relief, Giordano has no equities on his side.  He has intentionally breached his contracts, and has deliberately misappropriated Fidelity's trade secret customer information. *See Karpiak*, 2007 WL 136743 at \*15-16.

The requested injunction would have no meaningfully cognizable effect on Giordano. Under the injunction, Giordano remains free to work for Merrill Lynch and can freely compete with Fidelity for the patronage of the public at large.  He will simply be restrained from further breaching his contractual obligations to Fidelity and utilizing Fidelity's protectable information. Accordingly, the balance of equities favors Fidelity, and injunctive relief would serve the public interest.

## V.   A Temporary Restraining Order Will Maintain the *Status Quo* Pending Arbitration

A temporary restraining order is appropriate to preserve the *status quo* that existed as of the last peaceable act—immediately prior to the misappropriation of Fidelity's trade secrets and solicitation of its customers. To preserve that *status quo*, a temporary restraining order should require Defendant to return all Fidelity data and to refrain from further solicitation of Fidelity customers that Giordano serviced or whose information he became aware of while at Fidelity.

An order enjoining Defendant from misappropriating Fidelity's trade secret customer information and prohibiting solicitation of Fidelity customers would return the parties to the *status quo* without any undue prejudice to Giordano's ability to earn a living. *See, e.g., Ruscitto v. Merrill Lynch*, 777 F. Supp. 1349, 1354, *aff'd*, 948 F.2d 1286 (5th Cir. 1991) ("The present record plainly shows that Merrill Lynch's request is reasonable. Ruscitto may continue to compete as a stockbroker in the same locale. He is merely restricted for one year from soliciting clients whom he served or whose names became known to him while employed at Merrill Lynch.").

## VI. This Court May Enter Injunctive Relief Even Though the Merits Will Be Decided in Arbitration.

Fidelity is entitled to injunctive relief from this Court pending FINRA arbitration. The United States Circuit Courts of Appeal for the First through the Eleventh Circuits all have held a party may properly seek and obtain immediate injunctive relief to preserve the status quo and prevent irreparable harm pending arbitration, including five Circuits having so held in cases involving exactly this type of injunction action pending securities industry arbitration. *See Performance Unlimited v. Questar Pub.*, 52 F.3d 1373 (6th Cir. 1995); *Peabody Coalsales v. Tampa Electric*, 36 F.3d 46 (8th Cir. 1994); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 214 (7th Cir. 1993); *Blumenthal v. Merrill Lynch*, 910 F.2d 1049 (2d Cir. 1990); *PMS Dist. Co. v. Huber*, 863 F.2d 639 (9th Cir. 1988); *Merrill Lynch v. Dutton*, 844 F.2d 726 (10th Cir. 1988); *Teradyne Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986); *Ortho Pharm.*

*Corp. v. Amgen Inc.*, 887 F.2d 460 (3d Cir. 1989); *Merrill Lynch v. Bradley*, 756 F.2d 1048, 1054

(4th Cir. 1985); *Ruscitto*, 777 F. Supp. 1349; *Merrill Lynch v. Hegarty*, 808 F. Supp 1555, 1561

(S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir. 1993) (per curiam).

In *Bradley*, the Fourth Circuit expressly held:

> The arbitration process would be a hollow formality where the arbitral award when rendered could not return the parties to the *status quo ante*. …When an account executive breaches his employment contract by soliciting his former employer's customers, a nonsolicitation clause requires immediate application to have any effect. An injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The customers cannot be "unsolicited." It may be impossible for the arbitration award to return the parties substantially to the *status quo ante* because the prevailing parties' damages may be too speculative.

756 F.2d at 1053-1054 (emphasis added) (internal quotation marks and citation omitted).

In fact, under FINRA's subsequently enacted Rule 13804, FINRA has made clear in its

own arbitration rules that parties such as Fidelity are required to seek and obtain immediate

injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is

permitted to proceed. Thus, Fidelity's election to seek immediate injunctive relief from both

FINRA and this Court is not only consistent with, but indeed is required under, the FINRA Code

of Arbitration Procedure.

## VII.    There Is No Need for a Bond

Although a bond is required under Federal Rule of Civil Procedure 65(c), the district court

has wide discretion as to the amount. In fact, "[t]he district court may dispense with the filing of

a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining

his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Here, Fidelity has

demonstrated an overwhelming likelihood of success on its claims and has made a clear showing

of ongoing and irreparable harm. The requested injunctive relief will not impede or prevent

Defendant from conducting business. Rather, the requested injunctive relief will narrowly enjoin

Defendant from continuing to unlawfully solicit Fidelity's customers and from retaining Fidelity's confidential and trade secret customer information.  Accordingly, Fidelity respectfully requests that the Court either dispense with the bond requirement, or at most require a nominal bond.

## VIII.   Request for Limited, Expedited Discovery

Fidelity further requests the right to take limited, reciprocal, expedited discovery in aid of preliminary injunction proceedings.  Specifically, Fidelity requests narrow discovery limited to five document requests to be served on Defendant, to be responded to on a shortened basis, and the ability to take his deposition.  Fidelity agrees to also respond to five document requests and to produce a deponent for deposition if requested by Defendant.

Expedited discovery is necessary so that Fidelity can gather critical and necessary evidence for the upcoming preliminary injunction hearing to show that Defendant has retained, re-created and/or disclosed Fidelity's confidential customer information and to determine the scope and extent of his solicitation of Fidelity customers.

Federal Rule of Civil Procedure 26 provides courts with very broad discretion to manage the discovery process.  While discovery is generally not permitted before the Rule 26(f) conference, the rule nonetheless permits the court to set the timing of discovery for the convenience of the parties and the witnesses and in the interests of justice.  See Fluke Elecs. Corp. v. CorDEX Instruments, Inc., 2013 U.S. Dist. LEXIS 19540, *35-36 (W.D. Wash. Feb. 13, 2013); citing Am. Legalnet, Inc. v. Davis, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009.; see also Fed. R. Civ. P. Adv. Comm. Notes (1993 amendments to Rule 26(d) (expedited discovery is appropriate "in some cases, such as those involving requests for a preliminary injunction or motions challenging personal jurisdiction").

Good cause exists here to permit the limited expedited discovery Fidelity seeks because: (1) it is being sought in aid of a preliminary injunction hearing; (2) it is limited and reasonable in scope and therefore not unduly burdensome to any party; (3) Fidelity seeks expedited discovery only to determine the extent and precise nature of the Defendant's use and disclosure of Fidelity's confidential information and trade secrets to solicit Fidelity's customers; (4) the request is made no earlier than necessary for use at the upcoming hearing; and (5) it will enhance the efficiency of the preliminary injunction hearing by allowing the parties to prepare a streamlined presentation of evidence. See Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc., 1998 WL 404820 at *2 (E.D. Pa. July 15, 1998) (discovery in aid of a preliminary injunction hearing will "better enable the court to judge the parties' interests and respective chances for success on the merits.").

## CONCLUSION

For the foregoing reasons, Fidelity respectfully requests that this Court grant its Motion for a Temporary Restraining Order and Preliminary Injunction and enter Fidelity's proposed order against Defendant Michael Giordano pending expedited arbitration on the merits before FINRA or further order of this Court.

Dated: January 23, 2018

Respectfully submitted,

FISHER PHILLIPS LLP

Susan M. Guerette
150 N. Radnor Chester Rd., Ste. C300
Radnor, PA  19087
TEL: (610) 230-2150
FAX: (610) 230-2151
sguerette@fisherphillips.com
*Attorneys for Plaintiff*